This case on the Doctrine 2-18-0456, Anna Jane Powell, plaintiff appellant, Dean Adetai, Doris, defendant appellee. Our hearing on behalf of the plaintiff's appellant, Mr. Williams, and Mr. Walsh. Our hearing on behalf of the defendant's appellee, Mr. John E. Abbott. Good morning. And Mr. Walsh, you may proceed. May it please the Court, Counsel. Your Honors, we're before you today in this employment discrimination retaliation case. And I'd like to argue two primary issues with you today. One is, did the trial court apply the proper standard in determining that the plaintiff and two male co-employees were not similarly situated for purposes of her discrimination claim? The other issue being whether the trial court properly found that the plaintiff did not engage in protected activity when she complained that her supervisor was biased for purpose of her retaliation claim. If time permits, I'd like to address one procedural issue regarding the motion below. Turning to the first issue, which is the similarly situated issue. Under Illinois law, this Court held in the Walmart case in 1999, the standard is, are the employees involved similar enough, are they sufficiently parallel in their circumstances to permit an inference of comparability? That is, if we look at them, are they similar enough so that differential treatment can be attributed to discriminatory animals? Well, in this case, the trial court found that they weren't similarly situated because, didn't it find because they weren't like of the same grade in the court below? Judge, I believe on pages six and seven of the Court's opinion, the Court finds that although they were performing essentially the same duties, and they were reporting to the same person, and they were held to the same standards, two factors, the plaintiff's job performance reviews were lower than the male employee's, and she had more experience. So you have three common factors. The Court looked at two, experience and job performance. The cases are very clear. The case cited, the Barracks case cited in defendant's brief says, you look at these factors provided they actually play a role in the employment decision at issue. Here if we look at job performance, and we look at weeks in July of 2014 where Valerie Christopherson, the supervisor, assigns my client three additional business units to support through financial analysis. At that time my client was already working 50 to 55 hours per week. Christopherson has given her three below average ratings leading up to that time, including on July 25th of 2014, just 30 days essentially before she loads her with these three additional units. Wasn't, isn't there some logic that she should get those three units because they were done by a person she, previously done by a person she had supervised, and therefore she had some knowledge of them? That is part of what the defendants argue here, Judge. And the defendants are entitled to make that argument, obviously to a jury. The question that we would put before the Court is, are the facts sufficiently close or comparable here or parallel to enable a jury to say, these aren't close enough. We have a person who's working 50 to 55 hours a week, not meeting the supervisor's expectations, and yet the supervisor turns around and gives that employee 20 to 25 hours more work per week, meaning she's going to be working 70 to 80 hours per week. Just like a lawyer. Just like a lawyer sometimes. Right, yes. Thank you. You feel that she's setting her up for failure. I do. But let me, let me go back, let's go back to similarly situated. Your client talked about this Bowden gentleman. Abbott claims that you forfeited the ability to use this, I don't know how you say his name, dose, dose call? Dose account. Yeah, that you forfeited that because you never really mentioned or referenced him as an employee previously who was similarly situated. What's your response to that? My response is I believe the record is replete with references to that. I don't have a record citation off the top of my head to dose scale. Is his name pled somewhere? Yeah, it's in the summer judgment, for example, Your Honor, and the trial court identifies him in its ruling. And to go back to the job performance, as I was saying, defendants brief recognizes that factors such as experience and job performance are relevant only if they actually played a role. And my point here is that job performance could not have played a role. It just couldn't have. You have, as I mentioned, my client's working her tail off. She's now given all these mortgages. She's not performing well, even at 50 to 55 hours per week. And over here you have two gentlemen. I do want to focus on Mr. Bowden. Edward Brito, who was Valerie Christopherson's boss beginning in late 2014, testified that Bowden and dose account both have the capacity to take on this additional work. He also testified that Bowden was a better financial analyst than my client. So you have Christopherson shuffling off all of 20 to 25 hours of additional work per week to my client, who's being buried. And you have this guy over here who's a better financial analyst. That's all the duties they were performing. My client, even though she had the title of supervisor, she had been stripped of her supervisory duties by Christopherson in August of 2013. The record is absolutely undisputed that for the last 16 months of her employment, she supervised no one. And that same Edward Brito testified that once she was stripped of her supervisory duties, she effectively performed the duties of a financial analyst, which is what Bowden was doing. The question that I have, if you got past here and got back in front of a jury, you've got a group of people who are looking at someone who is given a grade of 14, I think, or 17, and others who have grades of 14. On its face, that looks like they're not similarly situated. How are you going to explain that, or how would you explain it to me? Your Honor, I would explain. The test is a flexible, common-sense one. In the Coleman v. Donahoe case, 667 after 462 or 642, I may be getting those confused. It's a common-sense analysis, and it says, are there enough common factors here for the jury to find that they're sufficiently similar where we can attribute discrimination? And the court goes on to say that to beware of requiring too close identity, because the McDonnell-Douglas indirect method test, which this is part of, was adopted to make the plaintiff's burden easier. It was intended to give the plaintiff a boost, because employees would almost never have direct evidence of discrimination. Few and far between are the employers who say, I'm letting you go, or I'm giving you all this additional work because you're a woman, or I'm giving you all this additional work because you're older. So the Supreme Court, McDonnell-Douglas, which the Illinois Supreme Court adopted in Xantaraca, said, let's make this easier. And as Judge Hamilton, writing for the Seventh Circuit in Coleman, says, beware requiring one-to-one mapping of these factors. Are we moving on to pretext, then, now? No, Your Honor. The reason I brought up job performance there is to establish that that factor could not have played a role in Christofferson's decision, and therefore, it's not relevant to the similarly situated analysis. Okay. Well, what about, then, the salary? I assume that there is a significant salary differential between Bowden and your client, or there was at the time they were employed. Is that strictly attributed to time of service, or does it relate to job performance as well? I don't know that the record is absolutely clear on that, Judge. But, again, if you look at it in the context, not in the abstract, are they different in some way? When you look at it as you must in the context of the specific decision we're talking about, which is the inundation of this additional work in July, what does salary, how could salary possibly explain that? How could experience possibly explain that decision? You have a person who's not performing up to expectations, according to Christofferson, with one unit, the building and grounds unit. Jerry, there's no dispute that Christofferson said that. And so now she's going to give her 20 to 25 hours more work per week on the pretext that she makes more money. There's no evidence in the record that she considered salary as a factor. And without that evidence, it's not even relevant to the analysis. But I'd like to point the court to just one other fact in this regard, and that's Ms. Christofferson's November 4, 2014 memo, which requests the termination of my client. On page 2 of that memo at the bottom, there are several bullet points. The very first bullet point, the very end, says, and I'm paraphrasing, says plaintiff complained about her workload vis-a-vis her peers. Now, at that time, there were only two other employees reporting to Christofferson other than the plaintiff, Bowden and Dosickel. And if Valerie Christofferson looked at the three of them as peers, then I submit to your honors, a reasonable jury could as well. Turning to the second issue I'd like to address with the court, which is whether the plaintiff engaged in protected activity. In February of 2014, my client received her performance review for 2013. She was very upset with it. And she called HR. And she talked to a woman named Notorshi Wilson in HR. Notorshi Wilson is a senior HR specialist. She also happens to be a paralegal. And my client went to Ms. Wilson and said, I got this bad review. My supervisor is just biased. She nitpicks and scrutinizes my commentary. She treats this other guy, Lucas Bowden, more favorably or better than me. Now, the question is, use of the word biased, does that trigger, is that a word that a reason? Isn't that pretty vague, though? I mean, bias could be anything. Does it have to be based on a protected class? It does not, Judge. I do not believe it has to be based on that. The question is in the context. What if my, I mean, I didn't mean to, I could read your facial expressions. What if bias is, you know, Bowden does a better job? It could be. That would not be a reason to find this as a improper bias. Right. I think, again, Judge, you have to look in the context of the actual statement made and to whom it is made. This is that she's not talking to a co-employee, complaining about his performance. She's talking to HR. She's talking to a senior HR specialist. And I think the proof of the pudding here is another senior HR specialist said, if some employee came to me and told me their supervisor was biased, I'd look into it. I'd investigate it. So the test, and it's important in this context, we take the test from the Galdiero Ambrosini case, the Second Circuit U.S. Court of Appeals from 1998, and it says an employer, there's protected activity if a communication is such that an employer is aware or should reasonably be aware that there's a complaint about a prohibited employment practice. The EEOC essentially adopts the same standard. It is even broader in its protective umbrella by saying that an employee can complain about, in broad, ambiguous terms, about unfairness, and that's sufficient to get under that umbrella. Even the Andon Assami case, the 2008 Seventh Circuit case, the defendants rely on. I believe the court says there it's protected activity, and there I think you're dealing with an email, if a reader would interpret it as complaining about an employment practice. And here in this context, when you go to HR and you say, my supervisor is biased, and, Your Honor, the word bias in ordinary English is a synonym for discrimination. And the case law discusses them interchangeably. So in the employment context, the U.S. Supreme Court in the Stout case talks about bias and discrimination interchangeably. So the issue here is whether the employer reasonably should have been aware that there was an actual or potential EEOC issue. And I believe the evidence, that statement is sufficient for a reasonable jury to find that, yes, it could. Did the court evaluate this on the McDonnell-Douglas framework? That's correct. Do you feel he was correct in doing so? I feel, Judge, that was the procedural issue. May I finish? Please. That is the procedural issue I was going to discuss with Your Honors, which is on a motion for summary judgment, this is absolutely bedrock law. The defendant must establish that the plaintiff cannot produce a submissible claim to a jury. In the employment discrimination context, there are two tests. There's the direct method of proof, and there's the indirect method of proof. The defendants only argue one below. And the court dismissed the entire case. We pointed this out in our summary judgment brief. And the court essentially said in one sentence, well, you didn't produce evidence to directly show employment discrimination. Essentially putting the burden on us. Correct. Could you use some, did you use the whole, evaluate the whole case, not just the single issue? That's correct, Judge. The court, you submitted in your briefs, didn't do that in this case. That is correct. Any other questions, Your Honors? No. All right, you'll have an opportunity to reply, Counsel. Thank you. Mr. Klinghoffer. Thank you, Your Honor. May it please the Court, Counsel. I'll answer a few questions to respond to a few arguments that were articulated in opposing Counsel's argument that I think might be helpful to each of you. There was an allegation or a statement that Ms. Lau, Mr. Bowd and Mr. Dosicall were not held or were held to the same standard. The record shows that they absolutely weren't held to the same standard. They were held to different standards. Specifically, Ms. Lau was a grade 17 employee, and not surprisingly, as a result of being a grade 17 employee and making more than $45,000 more than Mr. Dosicall and Mr. Bowd, there was a higher expectation. The record is clear with this. There was a higher expectation with respect to work quality, work efficiency, and knowledge. Lau would be expected to do more difficult work than a grade 14. Lau would be expected to work more efficiently than a grade 14. Can someone come into that unit, the GES unit, Global something, off the street and come in at a higher grade or a grade other than entry level because of experience outside of the unit? Yes, that's possible. That's possible. In this case, Ms. Lau, it's not disputed, had far more experience than either Mr. Bowd or Mr. Dosicall. She was there a lot longer than that. That is correct. That's absolutely correct. And Eduardo Britto, who was mentioned in the counsel's argument at C-564, testified that the expectation, and there's more expected out of the 17 based on years of experience, based on your getting higher pay, you expect more, that expectation is higher. So it's clear that they were operating under different expectations, and the record is clear that way. Well, they were performing the same work, right? At the time of the termination, they were performing same duties, obviously doing different work. They were in the same unit. They were in the same unit. They had the same supervisor. That is correct. That is correct. What's different is the grade level, right, the $45,000 in pay, their years of experience, and the fact that they were rated and being rated under different expectations. And here, you know, as Plaintiff indicates in her brief, the central issue in this fact is whether the, quote, unquote, critical factual question in the circumstance of this case is whether Christofferson treated Plaintiff less favorably than Bowden and Dosicall when she substantially increased Plaintiff's workload. And the record is also clear that Christofferson took into account the difference in experience and grade level when assigning the work. She testified as such. How about days off or work from home? Weren't they treated? She submitted in her briefs, in her argument, that she was treated differently than Bowden in that respect. All of those issues, and it was not, you know, it was addressed below where time line. However, with respect to someone who was being performance managed, there was an expectation that they'd be here to be able to be performance managed. I just want to make it clear and cite to the record exactly where Ms. Christofferson states that she relied on grade level experience. Okay, and that was at C-598, specifically interdeposition. She testified in response to opposing counsel's questions. Now, you could have assigned any of the business units or consolidation packages to other employees within the group. Answer, at the time only had two analysts, grade 14 analysts besides Anna. They were both pretty well worked with or at the capacity with the workloads with what they were doing. Were their workloads as large as Anna? Answer, no. But that's because they were grade 14. Answer, yes. She absolutely took into account that she had a higher level employee who should be able to work more efficiently and have more knowledge to do the work, and that's why she assigned. But prior to Ms. Christofferson taking this supervisory position, I think it was Mr. Nix or Mr. Hicks or someone else, she was still working 50 to 55 hours on her grounds and whatever. I can't remember the unit. She was still putting in that time. That didn't change between the prior supervisor and Ms. Christofferson, did it? No, I don't think there's any record evidence that it did change. What did change is that this was a shrinking department, and everybody was required to perform more work. It's a question of how are you going to distribute work. So what other work did Mr. Bowden get during this period? Mr. Bowden was assigned, the record is clear, Mr. Bowden was assigned an additional unit. A unit. That is exactly correct. M&M or maintenance or something? Correct, correct. But Ms. Lau got three different units that had taken Ms. Harder, prior to the maternity leave, 20 to 25 hours. Another full work week. Right. Ms. Harder was a far less experienced and less efficient person. There was an assessment made, a business judgment made. It turns out after Ms. Lau left, Mr. Bowden had to take on additional work. Eventually he left. Eventually it was all done by one person in somewhat of a different form, but all done by one person. This is a business judgment. It was clearly connected to the fact that she had a higher paid, more experienced employee and two less experienced, lower paid employees, and she distributed the work accordingly. So if, I mean, if we take that to its logical or illogical conclusion, if I'm paid twice as much as Justice Shostak, which we know as a matter of record is not the case, I should do twice as much work as she does in the same period of time. If the reason that you're paid twice as much is because you're more efficient and you're more experienced, one would argue yes. But we know that this woman was not more efficient because she was struggling to adequately perform her work prior to getting all of the new work, correct? She was struggling. She was having performance issues. Her performance. We had already removed some of her duties to assist her, removed the supervisory duties, and she was continuing at the same grade level, at the same pay, being rated under the same expectations. One issue I also want to clear up. Isn't that argument a bit disingenuous? Ms. Harder is now gone because she went to maternity leave and then she left. There was an intern that was there for a period of time, and I'm not sure when, but if the department is shrinking, who is she going to supervise? Mr. Bowden? I mean, you don't have anybody else left. Conceptually. Either way, I think the record did state that the reason that the supervisory duties were I think, actually, I want to clarify something now that I processed your question. I apologize. Ms. Harder was there, still employed at the time they removed her from the supervisory duties. It wasn't that Ms. Harder left and she no longer supervised her. She wasn't supervising Ms. Harder when Ms. Harder was still employed after she returned. She went to a different unit, right? Yes. Well, a different unit? Because how, then, would she cross over to? I think the record is that she left. She left the department, was no longer doing this type of work. Well, that would be hard for Ms. Law to supervise, wouldn't it? Yes, but the removal of those duties occurred before Ms. Harder even left the unit, went to do different work. Just to clarify the record. The one point that was also brought up in the opening argument was the Dosakow and Bowden issue, and the issue was, in her deposition, she was asked who's similarly situated, and she only identified Mr. Bowden. At Sotomayor judgment, Ms. Low then identified Mr. Dosakow for the first time. So it wasn't as if that was just brought up for the first time on appeal here. The issue was there was a difference at her deposition. She only said there was one similarly situated person, and then in her briefing she identified a second Mr. Dosakow. It doesn't matter, I think, from our perspective, because Mr. Dosakow and Mr. Bowden are similarly situated. They're both grade 14. They both were making approximately $45,000 less than Ms. Low. So with respect to the standard that was applied, the standard that the court applied below is the same standard that plaintiff argued to the court below and the same standard we articulate here, which specifically is an individual must be directly comparable to the plaintiff in all material respects. And we will concede to the court that depending on the circumstances, that test may change. The cases cited by Ms. Low where people had different jobs and even different supervisors and were found similarly situated were misconduct cases. For example, Ms. Low's counsel articulated Coleman, the case Coleman. In that case, there was a plaintiff who threatened to kill somebody. You would think that's reasonable to terminate him. Unfortunately, there were other coworkers who held another employee down and had a knife to his neck and weren't terminated. In that case, the fact that those two people didn't report to the same supervisor and didn't have the same job. It was the conduct that helped them. It was the conduct. It was similarly parallel conduct. And Coleman, I think, is instructed here because he says what's the purpose of similarly situated? And what it is, it's to eliminate explanatory variables such as different roles, performance histories, decision-making personnel, which helps isolate the critical independent variables. How do you distinguish the Burdine case? Yeah, how do I distinguish Burdine? In this regard, the court, what I would say is here the court looked exactly to the right variables to eliminate and didn't. So I'm not sure I answered your question fully if I understand it. Here the court looked at exactly the right things and came to exactly the right conclusion with respect to the similarly situated question, which absolutely has to be asked in this case when over and over again plaintiff's complaint and plaintiff's argument is that Ms. Lau was treated less favorably than Lucas Bowden in her complaint. Paragraph 19 at C9, defendant treated plaintiff less favorably than similarly situated male employee. Who was that? It was Bowden and Dosico. Defendant treated plaintiff less favorably than similarly situated younger employees. Bowden and Dosico. Defendant treated plaintiff less favorably than similarly situated non-Asian employees. Complaint at paragraph 39. Again, Bowden and Dosico. So it's clear here that this can't not be asked and is not part of the prima facie case. It is part of the prima facie case. Moving on to retaliation. Isn't there some conflicting evidence to raise a factual dispute? I don't think so. I don't think so. Because we're at the summary judgment. That's exactly right. So the question is, are they similarly situated? Well, we have one employee who's three grade levels above, with far more experience, and is paid for. The totality of that, I think the question is, isn't that a factual determination? I mean, you're sitting there, well, it's grade level, it's money, and it's job. They're doing the same thing. But those are factual determinations. They're factual. It's not quite so black and white as you would have us believe. Well, I would argue that courts, on a regular basis, apply this test and have to apply the facts. Yes. And to the prima facie case. But the facts can be interpreted in a variety of ways. There's nothing that can be interpreted about this particular set of distinctions between Ms. Lau and Mr. Bowden that would do anything to make these two people or these three people comparable in any way. She was doing work that they were doing, but she was being rated to a higher expectation. She was expected to do more work. But in the deposition, I think it was in the deposition of Christofferson, I think somebody asked her why she didn't assign some of these duties, even the smallest duties, to Bowden or Dosicall. And she said they said you didn't even assign a small QA unit. And she said she didn't know why she didn't do that. She didn't recall two years later why she made a specific determination with respect to a specific unit. But importantly, in that same analysis, or in that same discussion, there was a question about, well, what about the consolidation packages, which, as Ms. Lau's counsel pointed out, took two to four hours a month. Why didn't you assign those at least? And the answer was I couldn't because those are done by supervisory-level employees, and these employees didn't have the experience to do that. And that's a regulatory issue? No, that's a quality control issue. We don't have lower-level employees do that type of work. It's done by people at this level. We have confidence in their experience to do that. Where does it start? Does it start at 17 or does it start at 15? The record was supervisory-level, and the lowest supervisory-level is 17. Okay. So with respect to the question of whether or not Ms. Lau engaged in protected conduct, we would argue, and we did argue below, that she did not. And this issue was just addressed by the Seventh Circuit last year in SCEVA, and what is statutorily protected activity? It requires more than simply a complaint about some situation at work, no matter how valid the complaint might be. Rather, the complaint must indicate that discrimination occurred because of protected class. Merely complaining in general terms is not enough. Here, plaintiff complained under less than nine occasions, not once. Did she articulate that it was because she was being mistreated because she was Chinese or because she was over 40 or because she was Asian or because she was a woman? Not once. She did say other, well, on occasion I thought it was just other persons in the division, but it's a pretty small division, so it's really not that hard to figure out who she's complaining about. But in particular, didn't she say younger? Did she say that Mr. Bowden was younger? I don't know of a record site where she says Mr. Bowden was younger. Mr. Bowden was younger. She did identify Mr. Bowden. It's undisputed about that. However, she didn't articulate what about Mr. Bowden caused him to be treated more favorably. Was it because he wasn't Chinese? Did she ever use the word male? No, she specifically identified Mr. Bowden, who happened to be male. Yes. And there was simply nothing in her language that would have led anybody to tie it to the fact that she's over 40, that she's Asian, that she's Chinese. And in Skiba, right, to the argument, well, she said bias, and that should be enough. Skiba, the person said, you discriminated against me. The supervisor discriminated against me by nitpicking, in essence, nitpicking my work. But doesn't the discrimination have to be based on something that's protected? I can discriminate you if I think you don't do a good job. You're absolutely 100 percent right. That's exactly right, and that's why the Skiba. When she says, my supervisor is biased against me vis-a-vis Mr. Bowden, and I look at you when you're female and Mr. Bowden, I can make the assumption, is probably male, going by Mr., isn't that enough? That can't be enough. Why not? It can't be enough because you can't. An employer shouldn't have to look at the differences between employees to determine whether or not someone's engaged in protected conduct or not. Here, it happened to be that Mr. Bowden was younger. Not younger, male and female. It happened to be that he was... On the basis of gender. It happened... My supervisor is biased. She didn't say that and didn't come close to saying that. She didn't hide the fact that she was female, and she pointed the finger at the co-employee who is male. Isn't that enough? I don't think so when you're dealing with a situation in this case, and here's why. She's talking to a female HR representative about her female manager and says that Ms. Christopherson, who, by the way, is a female over the age of 40, is biased against me. She treats Mr. Bowden better. There's nothing to indicate there that the treatment is related in any way to who Mr. Bowden is, what he looks like, or what his race is. I'm not talking about race. Let's just talk about gender. Were they on notice that this was a gender-based discrimination? I don't know how they would be. How would they not be? I respect your position that you're trying to argue here, but how would they not be on notice? The answer would be simply because she didn't say it. She didn't leave anything to say that Ms. Christopherson likes males better. She treats males better. She treats an individual better who happens to be a male. That's not enough. And it wasn't enough in Ski, but it's not enough here. Wasn't there some referencing to flirting with Mr. Bowden? Absolutely there was. And that was by her? Correct. And the case law is clear that differential treatment based on romantically motivated favoritism isn't protected under either Title VII or the IHRA. If you want the case, it's Preston v. Wisconsin Health Fund. What about going out for social events with at least one or two members of the unit, and since there are only four in the unit, leaving the fourth one out? She would go out after work for drinks, and they would invite Lau. Lau was working. She had 50 to 55 hours for the work. But why wasn't she invited? The record is not clear on whether that occurred and whether or not, or the reasons why that occurred just wasn't developed below. So here, I think we just need to reiterate, there was nothing. If we get to pretext in this case, and we get to the question of the direct and indirect method, as of a year and a half ago, Ortiz said, hey, there's no direct or indirect method. There's McDonnell Douglas, and then you've got to look at everything. And the court did that. The court did that below, and the court made it clear. There's no evidence connecting either the decision to assign Ms. Christopherson more work, the decision to terminate her, with anything related to Ms. Lau's gender, her race, her national origin, or any of the allegations that she made. There's just nothing here. There's not a straight remark. There's nothing. And that's why the court ended up where it did. I think it's important, again, to hammer home the differences between Mr. Bowden and Mr. Dozier. Well, if you want to wrap up, I think during one of the exchanges, the theme. I missed it. I'll wrap it up. No, I didn't, too, but he's been pointing at me. It felt long, but I didn't hear it. Thank you for your time. Thank you. Mr. Walsh. Thank you, Judge. Mr. Walsh, while you're coming up here, on the retaliation claim, the Title VII, the case law is pretty clear that you have to complain of the bias. It has to be basically laid out. Did your client lay that out when she went to complain about Christopherson? I don't believe it, Your Honor. I don't believe the record supports the conclusion that she used the word male or female or younger, if that's what Your Honor is getting at. So based upon the retaliation claim, is there enough there? The question is, is there enough for a reasonable jury to find that the employer should have been aware? None of the cases, notwithstanding Skiba and the use of the word discrimination, the employee complained that his supervisor berated him, and the court understood that as very clearly a personality conflict. That's what the court says in Skiba. But doesn't it have to be tied to some prohibited classification? I think in the context that we're talking here, Judge, where my client goes to an HR person, another HR person said it was enough. They would investigate it. The particular person she said, she talked to Wilson, said, no, I assumed she was using that term loosely. Well, why would you do that? Because she only complained about nitpicking and scrutinizing of my work. Well, but why was she complaining about that? She told you the reason. My supervisor is biased. She treats this other guy, Lucas Bowden, better. And under those circumstances, that is, I believe, I would submit to the court, unless you have to use magic words, which every court in the country has said you don't have to do. You don't have to say, I'm the victim of discrimination. I'm the victim of harassment. I believe I'm being treated differently on the basis of my gender or on the basis of my age. You have to give sufficient information to reprise a reasonable employer. And here, a senior HR specialist who is also a paralegal, that there might be an EEO violation involved. If using the word bias is not sufficient to get to a jury, then magic words are required. Well, how about the before test, if you will? Doesn't she have to show that but for this discrimination, she would have never been fired? I mean, look at her performance. Are you referring to the causation issue, Your Honor? Yes, she absolutely does. Under U.S. Supreme Court, I don't believe that the Illinois Supreme Court has decided the issue under the Illinois Human Rights Act, which is what this case comes before, Your Honors. However, in all of the cases, every case recognizes that the mere passage of time isn't sufficient to extinguish a good claim, so long as there are interlocking or linking incidents. What do we have here? When we look at, and I think the Brangman case, which we cite in our opening brief, to which there is no response in the response brief, that case is right on the money. It is on all fours, and summary judgment is denied in that case as to retaliation. So what we have here is in September of 2013, you have a bad midyear review. February of 2014, you have a formal review. April of 2014, she gets put on a performance plan. June of 2014, she gets this bad midyear. And amongst all of this, and I'd like to just address one other thing. My colleague, he spent a lot of time beating homeless. And this law was held to higher expectations. That justifies giving her all this additional work. No reasonable jury is going to find that. Somebody working 50 to 55 hours a week, not meeting expectations at that point, and you're going to say, no, she was actually at higher expectations. That's just not going to fly. And when my colleague says that what you're trying to do with the similarly situated analysis is eliminate explanatory differences. What could possibly explain the different treatment expectations? It's not going to work. Nor is job performance. Nor is experience. Nor is salary. None of those responds or corresponds to the decision that Christopherson makes there. And that's why when she was asked, I asked her, why didn't you at least give Bowdoin the small quality assurance? May I finish my point there? Why didn't you give Bowdoin that small unit? And her answer is, I don't know. And Brito, her boss, said, well, we gave her all those additional duties for her benefit. Without any other questions, Judge, thank you very much. Thank you, gentlemen, for your argument this morning. We do appreciate it. We will review the case, make a decision in due course, and we will now stand adjourned for the day. Thank you.